*In re* MARRIAGE OF JOSEPH A. UEHLEIN, Petitioner and Counterrespondent-Appellant, and BARBRO UEHLEIN, Respondent and Counterpetitioner-Appellee (Michael J. Dudek, Petitioner-Appellant).

First District (6th Division)    No. 1—91—1663

Opinion filed August 5, 1994.

Kalcheim, Schatz & Berger, of Chicago (Norah M. Plante and Michael S. Cohen, of counsel), for appellant Joseph A. Uehlein.

Michael J. Dudek, of Chicago, for appellee.

JUSTICE GIANNIS delivered the opinion of the court:

This appeal arises out of a determination regarding distribution of marital assets, spousal maintenance, and an award of attorney fees in connection with the judgment of dissolution of marriage of the petitioner, Joseph A. Uehlein, and the respondent, Barbro Uehlein. The trial court found that a portion of certain real property was a marital asset and that petitioner had dissipated the marital assets in the amount of $72,018. The court also awarded respondent spousal maintenance and entered an order awarding certain attorney fees and costs incurred on respondent's behalf. Petitioner has appealed the trial court's ruling as to distribution of certain marital

assets, the award of spousal maintenance, and the award of fees incurred on behalf of respondent. Respondent has cross-appealed the trial court's determination as to certain other assets. Counsel for respondent, Michael J. Dudek, has appealed the court's ruling as to the reasonable fees due on his petition for attorney fees and costs.

The record reveals that petitioner and respondent were married on February 17, 1972. Although the petition for dissolution of marriage was filed on August 29, 1984, and the parties separated in 1984, the trial on this cause did not commence until May 2, 1989. At that time, the couple's only child, Joseph, born May 2, 1972, was 17 years old and was a senior in high school.

At the time of trial, petitioner was self-employed as a carpenter and painter, and he operated his own home decorating and remodeling business. In addition, he managed and received income from two parcels of rental property. Respondent was employed as a certified nurse's assistant, providing home health care to Medicaid recipients. Respondent earned approximately $13,000 in 1988.

The evidence adduced at trial established that in September 1972, seven months after their marriage, the parties purchased a condominium located at 6344 North Sheridan Road in Chicago, Illinois, for $37,000. The couple made a $12,000 down payment for this property and obtained a mortgage for the balance. At the time of trial, the condominium had a market value of $63,000 and was subject to a mortgage balance of $12,000.

In 1977, the parties bought a single-family home located at 4941 North Tripp for approximately $57,000. The couple made a $2,000 down payment for this property and financed the remainder of the purchase price. Respondent continued to live in this home with the parties' son through the time of trial. Petitioner moved out of the marital home in August 1984. At the time of trial, the marital residence had a market value of $85,000 and was subject to a mortgage balance of $35,000, with equity of $50,000.

When the Tripp home was purchased in 1977, the parties leased the condominium to various tenants. Their most recent tenant caused extensive damage to the unit and, according to the testimony of petitioner, the condominium required $25,000 in repairs to return it to a condition in which it could be rented.

The evidence established that during the marriage, petitioner also had an ownership interest in four parcels of real property, including (1) a multi-unit apartment building on Spaulding in Chicago, (2) a multi-unit apartment building on Oakley in Chicago, (3) a parcel of land in Silver Lake, Wisconsin, and (4) a parcel of land in Germany. Except for the property located on Oakley, petitioner owned the above real estate jointly with his brother, Peter Uehlein.

Petitioner testified that subsequent to the parties' marriage, he sold his interest in the property on Oakley and deposited the proceeds of the sale into the couple's joint checking account. In 1977, petitioner traded his interest in the property located on Spaulding and in Silver Lake to his brother in exchange for title to a five-unit apartment building on Winnemac Street in Chicago. In addition to the exchange of title to these properties, petitioner also paid his brother $6,150 by check dated February 23, 1978, and drawn on the couple's joint account. Petitioner explained that although he and his brother had previously agreed that he would receive $50,000 for his interest in the properties on Spaulding and in Silver Lake, this agreement was subsequently altered, and the $50,000 was put into the building on Winnemac prior to the property exchange between the brothers. Petitioner testified that he never received this $50,000.

The property located on Winnemac was placed in a land trust held by La Salle National Bank. The trust granted petitioner the sole power of direction and made him the sole beneficiary of the trust. Petitioner testified that, at the time of trial, he lived in one of the five units in this building. Three units were rented, and one was unoccupied. Petitioner also testified that there was no mortgage on this property.

Respondent acknowledged at trial that the building on Winnemac was obtained in exchange for the properties on Spaulding and in Silver Lake, which had been acquired by petitioner prior to the parties' marriage.

Respondent also acknowledged that petitioner's interest in the real estate located in Germany was acquired prior to the parties' marriage. According to respondent, petitioner claimed this property was worth $40,000 in 1972 but later told her the property was valued at $200,000 in 1984. Respondent did not, however, offer any evidence as to the fair market value of this property at the time of trial, the source of any increase in the value of the property, or whether petitioner retained an ownership interest in this property. Petitioner testified that his interest in the property was bought by his brother, Peter Uehlein, sometime after 1976, but long before the parties' separation in 1984.

The evidence established that other property acquired by petitioner prior to the marriage included two accounts at banks located in Germany, and certain household furnishings, and a coin collection valued at $5,000.

During their marriage, the couple accumulated assets which included a motor boat purchased in March 1984 for $5,000, household furnishings, three automobiles, several bank accounts and investment

accounts, two individual retirement accounts, and six bags of silver coins. Petitioner testified at trial that he left all of the six bags of silver coins in the marital home when he moved out in 1984. This evidence was contradicted by the testimony of the respondent, who stated that petitioner took five of the bags and left only one bag in the marital home when they separated. Respondent acknowledged that she sold one of the bags of silver coins for $800 after the parties' separation in 1984.

The evidence established that the parties bought a 1978 Volkswagen which, at the time of trial, was being used by the parties' 17-year-old son. Respondent testified that she drove a 1983 Toyota which was valued at $2,000. Petitioner testified that he purchased a van in 1988 which cost approximately $15,000. After the van was stolen, petitioner received an insurance settlement in the amount of $5,000. He also received an insurance settlement in the amount of $1,218. Petitioner subsequently purchased a replacement van, using the $5,000 insurance proceeds as a down payment and financing the $10,000 balance. In addition, he used the $1,218 to replace many of the stolen tools.

The evidence established that after the parties separated in August 1984, petitioner withdrew $29,000 from an investment brokerage account held by Olde Securities in petitioner's name exclusively. Thereafter, this money was deposited with the Bank of Lincolnwood and later transferred to the Northwestern Savings and Loan into an account which bore the name and social security number of Sandra Turk's minor daughter. Petitioner stated that he did this "for tax purposes." Sandra Turk testified that this was done so petitioner would not have to report these assets to respondent or on his income tax return. According to Ms. Turk, petitioner told her the funds in this account consisted of money he had earned. Ms. Turk testified that petitioner never told her that this money had belonged to his mother.

In January 1986, petitioner gave Ms. Turk $8,000 out of these funds to use as a down payment on the purchase of a new car. Petitioner also sent approximately $19,000 to Germany for deposit in an account he had at a German bank.

Petitioner testified that his mother had given him between $12,000 and $14,000 to invest sometime in the late 1970's or early 1980's. Although petitioner asserted that this money had belonged to his mother and that he had invested it for her, none of the accounts in which this money had been deposited bore the name of petitioner's mother, and he could not produce any documentation to support the assertion that she was the actual owner of these funds. Petitioner

acknowledged that he did not report or pay any income tax on any capital gain when the funds were withdrawn from the brokerage account.

Petitioner admitted that during the period from August 31, 1984, to May 18, 1989, he withdrew $20,000 from an investment account held at E.F. Hutton. Petitioner testified that this account was originally opened in his own name sometime in late 1968 or early 1969, prior to the marriage. Petitioner did not present any evidence to rebut the presumption that funds contributed to this account after the marriage in 1972 were marital assets.

Respondent testified that, except for four months during 1974, she did not work outside the home from the time their son was born in 1972 to 1984. Although petitioner was responsible for virtually all of the couple's income during that time period, respondent helped him manage the rental properties by answering the phones and cleaning. Respondent testified that she was employed as a certified nurse's assistant and that she earned $13,000 in 1988. Respondent stated that she had income of $1,086 per month, excluding child support payments, and her monthly expenses were $1,485. Respondent testified further that she was forced to borrow $17,000 from family members to pay for living expenses and to prevent foreclosure on the mortgage on the marital residence after petitioner moved out in 1984. Respondent indicated that she had $60 in a savings account and had no stocks, bonds, or certificates of deposit.

At trial, petitioner testified as to numerous checks received as payment from clients for whom he had worked and which had been negotiated by Sandra Turk. Ms. Turk testified that these checks were deposited into her checking account, and the funds were used to pay living expenses for herself, for her minor daughter, and for petitioner. Petitioner testified at trial that when checks were negotiated by Ms. Turk, he did not "receive" the money and did not include those funds in his declaration of income.

We initially address petitioner's claim that the trial court erred in concluding that a portion of the real property located on Winnemac in Chicago was a marital asset. The trial court found that the $6,000 paid to petitioner's brother in exchange for the five-unit apartment building located at 1351 West Winnemac in Chicago was a marital asset. The court also found that the time spent managing the building contributed to the value of the property and should be included as a marital asset. The court concluded that the marital interest in the building on Winnemac was valued at $15,000, and the remaining value of the building was a nonmarital asset of petitioner.

Petitioner claims that the trial court erred in finding that any

portion of the real property located on Winnemac was a marital asset. Respondent asserts that the trial court should have found that the full value of the property on Winnemac was a marital asset because it was acquired during the marriage. The record, however, supports the finding of the trial court.

Petitioner testified that in 1977 he obtained the property on Winnemac by trading his interest in the properties located on Spaulding in Chicago and in Silver Lake, Wisconsin, both of which were acquired prior to the marriage, for his brother's interest in the building on Winnemac. Although respondent asserts that the trial court should have considered the full value of this property to be a marital asset because there was no evidence to support petitioner's testimony of the property exchange, the record establishes that respondent acknowledged at trial that petitioner acquired title to the building on Winnemac in the manner described by petitioner. Consequently, respondent's own testimony corroborates that of petitioner and supports the trial court's conclusion that, except for the payment made from the parties' joint checking account, the property located on Winnemac was nonmarital property owned by petitioner.

●1 Petitioner claims that the court erred in finding a marital contribution to the value of the Winnemac property in the amount of $9,000 for his time spent managing the building. The record indicates, however, that this contribution of time in managing the building was actually that of respondent based upon her testimony that she assisted petitioner by answering the telephones, dealing with tenants, and cleaning the buildings. Based upon this uncontroverted evidence, the trial court correctly determined that respondent was entitled to reimbursement for her contribution to the value of the property, and it was not an abuse of discretion for the court to include $9,000 for that contribution into the marital estate. See 750 ILCS 5/503(c)(2) (West 1992).

Petitioner also contends that the $6,000 payment toward the acquisition of this property should not have been considered marital property. The record indicates, however, that both parties admitted this payment was made by a check dated February 23, 1978, and drawn on the parties' joint checking account. Because the funds received by petitioner for the sale of the nonmarital property located on Oakley were commingled with the marital funds when deposited in the parties' joint checking account and used to acquire the property on Winnemac, the $6,000 check drawn on this account was properly considered a marital asset by the trial court. *In re Marriage of Davis* (1991), 215 Ill. App. 3d 763, 769, 576 N.E.2d 44.

We next consider whether the trial court erred in finding that petitioner had dissipated $72,018 in marital assets.

In its decree, the trial court found that petitioner's dissipation of marital property included the following assets:

(a) five bags of silver coins valued at $800 per bag;

(b) $1,800 in a loan from Prudential Insurance Company;

(c) $8,000 spent on the down payment of the car for Sandra Turk;

(d) $20,000 in funds sent to Germany which were marital assets and not the funds of petitioner's mother;

(e) $20,000 retained by petitioner from the E.F. Hutton investment account, in addition to $5,000 given to respondent and $5,000 used as a down payment on a new truck;

(f) $20,000 in checks diverted from petitioner's business and negotiated by Sandra Turk where the funds were used by petitioner and Sandra Turk;

(g) $5,000 received by petitioner as an insurance settlement; and

(h) $1,218 received by petitioner as an insurance settlement.

Petitioner admits that the $8,000 given to Sandra Turk for the purchase of a new car constituted dissipation of marital assets, but he challenges the court's finding of dissipation as to the remaining assets listed above. The record, however, supports the conclusion reached by the trial court.

●2 Although petitioner testified that he left all five bags of silver coins in the house when he moved out in 1984, this testimony was contradicted by respondent, who stated that petitioner took four of the five bags. The trial court was obligated to assess the relative credibility of the witnesses where there was conflicting testimony on issues of fact, and the court's determination will not be disturbed on review unless it was against the manifest weight of the evidence. (*In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 28, 500 N.E.2d 612.) In the instant case, the court's determination that respondent's testimony was credible and that petitioner left only one bag of silver coins in the house was not against the manifest weight of the evidence. Accordingly, we affirm the finding of dissipation as to this asset.

As to the $1,800 loan from Prudential Insurance Company, there was no evidence that this money was ever included in the funds held jointly by the couple as marital assets, but was used exclusively by petitioner for his own purposes. We hold, therefore, that the trial court did not err in finding that this money had been dissipated by petitioner.

Petitioner also claims that the court erred in making a determination of dissipation as to the $20,000 sent to his mother in Germany

because he was merely returning funds he had invested on her behalf. As previously noted, the trial court was obligated to assess the credibility of the witnesses where there was conflicting testimony on issues of fact. (*In re Marriage of Kaplan*, 149 Ill. App. 3d at 28.) The evidence established that after the parties separated in August 1984, petitioner withdrew $29,000 from the investment brokerage account held by Olde Securities. Thereafter, this money was deposited with the Bank of Lincolnwood and later transferred to the Northwestern Savings and Loan into an account which bore the name and social security number of Sandra Turk's minor daughter. Petitioner stated that he did this "for tax purposes." Sandra Turk testified that this was done so petitioner would not have to report these assets to respondent or on his income tax return. According to Ms. Turk, petitioner told her the funds in this account consisted of money he had earned. Ms. Turk testified that petitioner never told her that this money had belonged to his mother. Although petitioner asserted that this money had belonged to his mother and that he had invested it for her, none of the accounts in which this money had been deposited bore the name of petitioner's mother, and he could not produce any documentation to support the assertion that she was the actual owner of these funds. Based upon this evidence, the trial court's determination that the funds held in that account were marital assets was not against the manifest weight of the evidence. Moreover, we note that petitioner has admitted that the $8,000 given to Ms. Turk constituted dissipation of a marital asset even though that money was taken from the same funds which had been on deposit with Olde Securities. Thus, if the $8,000 is properly characterized a marital asset, the $20,000 which was sent to Germany is also a marital asset.

As to the funds withdrawn from the E.F. Hutton account, petitioner admitted that during the period from August 31, 1984, to May 18, 1989, he withdrew $20,000 from the investment account held at E.F. Hutton. Although petitioner testified that this account was originally opened in his own name sometime in late 1968 or early 1969, prior to the marriage, he did not present any evidence to rebut the presumption that funds contributed to this account after the marriage in 1972 were marital assets.

The trial court found that petitioner had dissipated $20,000 in funds diverted from his business and used by him and Ms. Turk. Petitioner testified at trial as to numerous checks received as payment from clients for whom he had worked and which had been negotiated by Sandra Turk. Ms. Turk testified that these checks were deposited into her checking account, and the funds were used to pay living expenses for herself, for her minor daughter, and for petitioner.

Petitioner testified that when checks were negotiated by Ms. Turk, he did not "receive" the money and did not include those funds in his declaration of income. We hold that this evidence supports the trial court's determination that petitioner had dissipated these funds.

The court also found that petitioner had dissipated the $6,218 received as insurance settlements when he purchased a new truck and replacement tools. Petitioner argues that the new truck and tools benefitted the marital estate because he used them to support his family. Yet, petitioner has not cited to any evidence in the record which affirmatively established that the new vehicle and tools were used to support his family and, thereby, benefitted the marital estate.

Based upon the foregoing evidence, we hold that the trial court's determination as to petitioner's dissipation of marital assets was proper and is affirmed.

We next address petitioner's assertion that the trial court erred in ordering him to pay maintenance to respondent in the amount of $300 per month, reviewable in 24 months.

Maintenance may be awarded where the trial court finds that the spouse seeking such an award lacks sufficient property to provide for his or her reasonable needs, and either cannot support himself or herself through suitable employment or otherwise lacks sufficient income. (750 ILCS 5/504(a) (West 1992).) An award of maintenance is a matter within the sound discretion of the trial court, and the court's decision will not be disturbed on review absent an abuse of that discretion. *In re Marriage of Sheber* (1984), 121 Ill. App. 3d 328, 340, 459 N.E.2d 1056.

At trial, respondent testified that she was employed as a certified nurse's assistant and that she earned $13,000 in 1988. Respondent stated that she had income of $1,086 per month, excluding child support payments, and her monthly expenses were $1,485. Respondent testified further that she was forced to borrow $17,000 from family members to pay for living expenses and to prevent foreclosure on the mortgage on the marital residence after petitioner moved out in 1984. Respondent indicated that she had $60 in a savings account and had no stocks, bonds, or certificates of deposit. Petitioner testified that he earned $44,247 in 1988 and lived in one of the units in the building located at 1351 West Winnemac, which was not encumbered by a mortgage. The trial court's decree specifically provided that the award of maintenance for $300 per month was reviewable in 24 months.

●3 Based upon the amount of respondent's income, living expenses, and the debt she was forced to incur after petitioner moved out of the marital home in 1984, we hold that the trial court did not

abuse its discretion in awarding her maintenance of $300 per month for two years.

We next consider respondent's contention that the trial court erred in failing to include the real property located in Germany in its judgment decree. We find this argument to be without merit.

Although the evidence established that petitioner had held an ownership interest in a parcel of real property located in Germany, there was no evidence that this property should have been included as a marital asset in the court's decree.

●4 Respondent specifically stated that she did not know when petitioner acquired the property in Germany. She testified further that petitioner showed her this property during their first visit to Germany in the fall of 1972, approximately seven months after their marriage. Because respondent could present no evidence as to how or when petitioner acquired this property, the evidence seems to indicate that he obtained the property prior to their marriage. Accordingly, it would be considered a nonmarital asset, and the trial court did not err in failing to include it in its judgment decree. In addition, there was no evidence to indicate that any increase in the value of this property (from $40,000 in 1972 to $200,000 in 1984, according to petitioner) resulted from a commingling of marital and nonmarital property or from the personal efforts of petitioner. (See 750 ILCS 5/503(a), (c) (West 1992).) Rather, the testimony of respondent indicated that the house which was constructed on the property, presumably causing the increase in value, was built by petitioner's brother Peter.

Finally, we address the propriety of the trial court's order that petitioner pay $28,500 in attorney fees and costs incurred on behalf of respondent.

The petition for fees filed by respondent's counsel sought an award of fees under section 508 of the Act without specification of a particular subsection. Section 508(a)(3) of the Act provides that the trial court may order either party to pay a reasonable amount for attorney fees necessarily incurred by the other party in any proceeding under the Act. (750 ILCS 5/508(a)(3) (West 1992).) An award of attorney fees is justified where the spouse seeking relief demonstrates (1) financial inability to pay, and (2) the ability of the other spouse to pay. (*In re Marriage of Hazard* (1988), 167 Ill. App. 3d 61, 71, 520 N.E.2d 1121.) Proof of financial inability does not require a showing of destitution and will be demonstrated where payment would strip the person of the means of support and undermine her economic stability. (*Hazard*, 167 Ill. App. 3d at 71.) The award or denial of attorney fees is within the sound discretion of the trial court, and that decision will not be disturbed absent a clear abuse of discretion. *Hazard*, 167 Ill. App. 3d at 71.

Petitioner claims that the trial court erred in requiring him to pay the reasonable attorney fees incurred on behalf of respondent.

●5 In its order awarding fees, the trial court specifically found that petitioner had a greater ability to pay attorney fees than did respondent. This conclusion was supported by the evidence adduced at trial, which established that respondent was not able to pay the fees of her attorney where she earned only $13,000 in 1988, with income of $1,086, excluding child support payments and expenses of $1,485 per month, and where she owed family members a minimum of $17,000. In addition, the evidence reflected that petitioner earned $44,247 in 1988. This evidence indicates that there is a significant disparity in the incomes and earning abilities of the parties. Moreover, a portion of the fees and costs incurred by respondent related to the need for her counsel to investigate and uncover marital assets which had been dissipated or hidden by petitioner. The court's order specifically stated that the petitioner's hiding of assets and providing false accountings to the court caused substantially greater work for respondent's counsel to find assets and to prove his case. Based upon this record, we hold that the trial court's award of fees incurred on behalf of respondent was not an abuse of discretion.

Respondent's attorney has also appealed the adjudication of reasonable fees, claiming that the court should have awarded the full amount of fees and costs requested in his petition.

On June 7, 1990, counsel for respondent filed a petition for attorney fees, paralegal fees, and costs. The petition sought a total award of $92,012.43. Of this aggregate amount, $75,573.50 consisted of attorney fees for services performed by respondent's attorney, and $12,467 consisted of paralegal fees for services performed by the wife of respondent's attorney. The remaining $3,971.93 consisted of costs incurred in pursuing the litigation.

The trial court found that this request was excessive and granted fees of $28,500 for services rendered by respondent's attorney, $3,500 for services rendered by the paralegal, and costs of $3,000, for a total award of $35,000 for attorney fees and costs. In entering this ruling, the trial court specifically noted that the record keeping of respondent's attorney was "lacking" and that the fee petition was excessive. The court found that the petition reflected much waste of time, inefficiency, repetition of work, and double-charging of time by respondent's attorney and the paralegal for the same conversation between them. The court stated that, based upon improper record keeping and improper billing, the fee petition was excessive in the total amount of $28,344.50. Upon consideration of the fee petition, with the reductions based upon excessive or improper fees, the court awarded attorney fees and costs of $35,000.

As an alternative to his claim that he should be entitled to the full amount of the fees requested in his petition, respondent's attorney asserts that the trial court made a mathematical error and that he should be awarded fees of $56,229, after subtraction of the fees which the court characterized as excessive or improper.

At the conclusion of the hearing on the petition for fees, the trial court found that $28,344.50 in the fees requested were improper, not $19,344.50 as asserted by respondent's attorney. The court granted $28,500 in attorney fees for services performed by counsel, $3,500 for paralegal services, and $3,000 in costs, for a total award of $35,000.

●6 We hold that the record supports the trial court's finding that certain individual entries by counsel and his paralegal were improperly billed or were excessive. After subtracting the $28,344.50 in improper fees from the total fee request of $92,012.43, the remainder equals $63,667.93. Of this amount, the trial court ordered petitioner to pay $35,000. We hold that the trial court did not abuse its discretion in awarding respondent attorney fees in the amount of $35,000.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.