FIRST DIVISION
 MAY 19, 1997 








No. 1-95-1705


In re MARRIAGE OF MILDRED KRANE, ) APPEAL FROM THE
 ) CIRCUIT COURT
 Petitioner-Appellee, ) OF COOK COUNTY.
 )
and )
 )
GERALD KRANE, ) HONORABLE
 ) DANIEL J. SULLIVAN,
 Respondent-Appellant. ) JUDGE PRESIDING.


 PRESIDING JUSTICE CAMPBELL delivered the opinion of the
court:
 Respondent Gerald Krane appeals from orders of the circuit
court of Cook County dissolving his marriage to petitioner Mildred
Krane and ordering him to pay maintenance and a portion of Mil-
dred's attorney fees.
 The record on appeal indicates that Mildred filed a petition
for dissolution of marriage on June 6, 1991. On September 24,
1991, Mildred filed a petition for temporary maintenance, alleging
that Gerald vacated the marital premises during May 1991 and had
not paid her for household expenses, including the mortgage and
assessments. On October 18, 1991, the trial court entered an
agreed order regarding payments for the mortgage and expenses
through December 1, 1991, and continuing the petition for tem-
porary maintenance.
 On December 23, 1991, Mildred filed a petition for a rule to
show cause, alleging that Gerald had willfully failed to comply
with the prior agreed order. On January 23, 1992, the trial
court: found Gerald in default on both petitions for failure to
appear; ordered Gerald to pay Mildred temporary maintenance of
$1,750 per month; stated that an order of withholding would issue
against all of Gerald's payors; and entered a rule to show cause
returnable on Mildred's motion.
 On February 3, 1992, Mildred filed a petition for a temporary
restraining order and other relief (TRO Petition). Mildred
alleged that she attempted to serve the trial court's order for
withholding on the Public School Teachers' Pension and Retirement
Fund of Chicago (Fund), because Gerald is a retired teacher whose
primary source of income was retirement benefits. The Fund
declined to comply with the order for withholding. The Fund
payments were being directly deposited into Gerald's account at
the Affiliated Bank (Bank) in Chicago. Mildred feared that Gerald
would remove these funds to defeat her right to maintenance, based
on Gerald's prior non-compliance and alleged failure to inform
Mildred of his location or to support her during the marriage. 
The trial court restrained Gerald from changing the Bank as the
depository for the Fund payments and from transferring, withdraw-
ing, or disbursing any Fund payments.
 On February 11, 1992, Mildred moved to add the Fund and the
Bank as third-party defendants. Mildred also moved for turnover
of funds from Gerald's account at the Bank in the amount of $1,750
per month. The trial court granted these motions, except for one
payment. The trial court also ordered the Fund to notify
Mildred's counsel of any request by Gerald to alter the depository
of his benefits or for direct payment.
 On March 3, 1992, Mildred filed another TRO Petition, alleg-
ing that she received a February 27, 1992 letter from the Fund
stating that Gerald had requested that his monthly payment be
directed to a new address. The trial court again enjoined Gerald
from changing the Bank as the depository for the Fund payments. 
On March 12, 1992, the trial court entered a similar preliminary
injunction against Gerald.
 On March 25, 1992, Mildred again moved for default, based on
Gerald's failure to appear since October 18, 1991, and his failure
to comply with the trial court's order that he provide an address
at which service of notice could be had upon him. Mildred also
filed another TRO Petition, alleging that she was notified by the
Bank that on or about April 6, 1992, a person identifying himself
as Gerald telephoned the Bank, seeking to close his account so
that his Fund payments could be deposited at a new location. On
April 9, 1992, the trial court entered an order of default and an
order restraining Gerald from closing the Bank account or seeking
to transfer monies from the account. The trial court also ordered
the Bank account frozen, except for sums to be paid to Mildred
under the prior court order.
 Gerald entered an appearance by counsel on May 4, 1992. On
June 18, 1992, the trial court entered an agreed order reducing
maintenance to $1,189.63. Gerald would receive $591.81 from the
Bank, approximately one-third of each Fund payment.
 The trial court began hearing Mildred's petition on April 6,
1994. Mildred was born on July 5, 1926. She was a high school
graduate with one year of junior college. Mildred first married
on September 15, 1954, and had three children from that marriage. 
Mildred's first husband passed away in March 1970. Mildred met
Gerald in 1971. 
 Gerald was born on April 25, 1925. Gerald had Master's
degrees in music and education. He began teaching part-time in
the Chicago Public Schools in 1949 or 1950, which led to the full-
time position he held when he met Mildred. Gerald began contrib-
uting to his pension in 1952, and retired in 1982 or 1983. Gerald
was also employed by RMC Realty from 1971 or 1972 through 1987. 
Gerald then sold real estate franchises for the ERA Corporation
through 1990. Gerald testified that his real estate license had
lapsed, but his license to sell insurance was current. Gerald
also made $200 to $250 weekly for approximately half of 1991,
selling organs for Fletcher Music in Florida.
 On March 2, 1972, Mildred and Gerald entered into an ante-
nuptial agreement (Agreement) drafted by Mildred's attorney. The
Agreement provided in part as follows:
 "2. That if [Mildred] shall survive
 [Gerald], or in the event of a divorce, the
 husband or wife under no circumstance shall
 acquire any legal rights to any of the prop-
 erty or the income thereof as a result of the
 marriage; separation or otherwise, [Mildred]
 shall not, as surviving wife, make any claim
 to any part of the property or estate of which
 [Gerald] may own or die seized or possessed;
 and [Mildred], in consideration of said mar-
 riage, hereby expressly waives and relinquish-
 es all right in and to the real and personal
 property of which [Gerald] may own or die
 seized, as well as all right in and to the
 personal estate of [Gerald], including Surviv-
 ing Spouse's Award, whether as surviving wife,
 heir at law, or otherwise."
Exhibits attached to the Agreement listed the assets of Mildred
and Gerald. Mildred's assets and liabilities included a checking
account, various savings certificates and securities, insurance, a
residence, an automobile, the assets of a trust established by her
first husband, and the net assets of the first husband's estate. 
Mildred had net assets of approximately $417,500. Gerald's assets
included pension contributions (then valued at $12,000), a check-
ing account, and an automobile, resulting in total assets of
$12,800.
 Mildred and Gerald married on March 5, 1972. They lived in
Mildred's home in Lincolnwood from 1972 to 1976. Gerald made
minimal contributions toward the expenses of the home. Mildred
sold her home in 1976. 
 Mildred then bought a residence on Lake Shore Drive. Gerald
did not move into this residence for approximately three and one-
half years. Mildred again testified that Gerald contributed very
little toward the expenses of the home. Gerald never paid the
mortgage, taxes or assessments on the property.
 Gerald moved out of the Lake Shore Drive residence in 1982. 
Mildred testified that Gerald moved into an apartment in Des
Plaines with another woman and an apartment in Skokie with yet
another woman. Mildred sold the Lake Shore Drive residence in
1983 because she could not afford to keep it. Mildred moved into
her mother's one bedroom apartment, sleeping on the couch.
 In 1986, Mildred moved into her own apartment. In 1989,
Gerald moved into Mildred's apartment. Gerald paid the rent and
some of the household expenses. Both Mildred and Gerald put up
money in 1990 to buy the apartment when it converted to a condo-
minium. Gerald made contributions towards the mortgage and
household expenses, and paid assessments. However, approximately
six months after purchasing the condominium, Gerald moved out. 
Mildred testified that Gerald moved in with the woman named
Pamela, with whom he had allegedly lived in Des Plaines; Gerald
denied this. Mildred further testified that approximately six
months after Gerald moved out, he disappeared.
 Gerald testified that he dated Pamela in 1989 and 1990, and
possibly in 1991 and 1992 as well. Gerald testified that he
assisted Pamela in applying for a discounted membership at his
health club under the name "Pamela Krane."
 Mildred testified that she did not have any special job
skills. She worked as a receptionist for a few months in 1971,
but did not work outside the home again until 1983. With the
exception of five years she spent with the Howell Foundation at
Northwestern University, Mildred went through a series of jobs
where she did clerical work or retail sales. Mildred was dis-
missed from her job with the Howell Foundation when it converted
to computers, with which Mildred lacked experience. 
 Mildred later found a weekend job showing apartments for a
real estate management company. In October 1993, she took a
better real estate job with the Realview Towers in Northbrook,
which paid nine dollars an hour. Mildred began working part-time,
but eventually worked 26 hours per week. When Realview Towers
presented her with medical benefits, Mildred informed her employer
that she had finished radiation treatment for cancer a few weeks
earlier. Mildred testified that she was fired from this job a
week prior to her testimony. Mildred explained that she tired
easily and that it was sometimes difficult for her to concentrate. 
Her hours were reduced to 12 per week prior to her dismissal, as
Mildred missed time due to the divorce proceedings.
 Mildred was also asked about the disposition of the assets
listed in the antenuptial agreement. Mildred testified regarding
the sale and purchase of her various residences during the mar-
riage. According to Mildred, she had spent funds she received
from her first husband's estate for living expenses. Mildred also
testified to sums she gave to her children over the years. 
 Mildred testified that a trust listed with assets of approx-
imately $49,000 and receivables of approximately $3,800 was
established by her first husband's will for the benefit of their
children. Mildred also testified that in 1977, she established
another trust with funds from the sale of her house and other
sources, but there was approximately $50 in that trust at the time
of her testimony. 
 Mildred further testified that she had approximately $6,000
in a money market account and $1,000 in a checking account. 
Mildred stated that she owned stock in an entity called Safe Card
she valued at approximately $8,000. According to Mildred, she had
just begun receiving $54 in weekly unemployment compensation
payments, though some of that payment was deducted because she
received Social Security payments.
 Based on an exhibit regarding her expenses covering a number
of years of her marriage, Mildred testified that in each year of
the marriage, her expenses exceeded her income. Mildred testified
that she was then receiving approximately $1,205 from the pension
and a net payment of $260 from Social Security, with no other
source of income. The reference to the pension appears to refer
to the maintenance payments, as Mildred testified that she had no
retirement account or pension income.
 Mildred testified that she paid $641 monthly for the mortgage
and real estate taxes on the condominium. Mildred also paid a
$212.20 monthly assessment. Mildred spent approximately $250 on
groceries and $10 on laundry and dry cleaning. Mildred also had
utility bills, which were not itemized in the testimony. Mildred
testified that there were a number of items listed on the expense
affidavit that she could no longer afford, including meals at
restaurants and grooming at a beauty parlor or barber shop;
Mildred had not had a professional haircut for three or four
years. Mildred no longer made a car payment, but testified that
her car was a 1987 model, that she experienced problems with the
car and that it might need to be replaced in the next year.
 Gerald testified that from July 1992 through May 1993, he
received food, shelter and some medical services from an entity
called the ARK. Gerald testified that he had no place to live and
was destitute at the time. Gerald later testified that he had
been residing with his sister for approximately one year.
 Gerald was questioned about an account at the Bank of Lin-
colnwood in the name of Gerald Krane and Jean Honoroff. This
account listed Ms. Honoroff's home and business addresses; Gerald
gave a post office box address. Honoroff had known Gerald for 26
years. Honoroff stated that she and Gerald were girlfriend and
boyfriend. Honoroff opened the joint bank account in December
1992 because she wanted Gerald to have some of his own money. 
According to Honoroff, the account is attributed to her for tax
purposes, but she never deposited or withdrew funds from the
account. Gerald testified that there was approximately $78 in the
account. Gerald also testified that he had maintained a joint
bank account in Florida with his son, but that his son never
deposited any money into the account.
 Gerald testified that he was receiving approximately $1,800
monthly on his teacher's pension and approximately $439 from
Social Security. Although Gerald was married to Mildred when he
retired, he waived survivor benefits and received a $5,000 payment
in exchange.
 Although Gerald testified that he had not sold insurance in
20 or 30 years, he admitted he had "a part of a company" called
the Gibraltar Insurance Agency (Gibraltar). Gerald testified that
he did not know where Gibraltar was located, but stated that it
"might be" in the same office as Richard Bradley and Associates. 
Jean Honoroff had owned Richard Bradley and Associates, an insur-
ance and financial planning business, since 1959. Gerald testi-
fied that Gibraltar also had been owned by Honoroff, but he did
not think that she currently owned it. Gerald denied that he was
employed by Gibraltar.
 Honoroff testified that in February 1995, she and Gerald had
spent a month in Germany. Honoroff paid for the trip. Gerald
also testified that in 1993, he travelled to Florida, California,
New York, New Jersey, San Antonio and Boston. Gerald paid for the
trip to California, but did not recall the cost of the trip and
had no documents that would show the cost. Honoroff or her
company paid for the remaining 1993 trips, which apparently were
related to business conventions. In 1991, Gerald had travelled to
Wisconsin and San Diego. 
 Gerald was questioned regarding his tax records. Gerald
testified that his 1989 federal income tax return listed income of
$45,350. A W-2 form attached to the Krane's 1990 joint tax return
listed Gerald's wages as $28,802.55; the return listed pension
income of $21,943. Gerald testified that his 1991 federal income
tax return listed income of $42,044. Gerald did not file tax
returns for tax years 1991-95.
 Both parties testified that family members had loaned them 
thousands of dollars in the recent past.
 Following the submission of written closing arguments, the
trial court filed its decision on December 1, 1994. The decision 
awarded Mildred exclusive ownership and possession of the condo-
minium and $800 monthly in permanent maintenance. On December 30,
1994, Mildred filed a motion to reconsider which, in relevant
part, sought a larger maintenance payment and an automatic 3%
annual increase in maintenance to correspond with an automatic 3%
annual increase in Gerald's pension payments. Gerald filed a
response, taking issue with various aspects of the trial court
decision. 
 On April 10, 1995, the trial court entered the judgment for
dissolution of marriage. The judgment recites that Mildred was
unemployed at the time of trial and that her only income other
than maintenance was a monthly Social Security payment of approx-
imately $300. The judgment also recites that Gerald received a
monthly pension payment from the Fund of approximately $2,100 and
monthly Social Security benefits of approximately $450. The judg-
ment increased the permanent monthly maintenance payment to $824 -
- a 3% increase -- and provided that the payments would increase
annually, commensurate with any increase in the pension payments. 
The judgment also included terms similar to the trial court's
prior orders that the Fund would deposit Gerald's pension into his
account at the Bank, which would then remit the maintenance to
Mildred and the remainder to Gerald. The judgment further includ-
ed terms similar to the trial court's prior orders enjoining
Gerald from changing the Bank as the designated depository for
payments from the Fund and requiring the Fund to notify Mildred of
any attempt by Gerald to change the designated depository.
 Also on April 10, 1995, Mildred filed a petition for attorney
fees. Gerald filed a Notice of Appeal to this court. Mildred
then filed a petition for prospective attorney fees regarding the
appeal. On August 16, 1995, the trial court awarded Mildred's
counsel $8,000 in fees and one-third of any costs incurred in any
appellate court proceedings. Gerald filed a timely second Notice
of Appeal.
 I
 Gerald initially maintains that the trial court erred in
ordering the method by which Mildred would receive the maintenance
payments, including enjoining Gerald from changing the Bank as
designated depository for the Fund pension payments. Gerald
argues that the judgment is an illegal attachment of the Fund
payments. Section 17-151 of the Teachers' Retirement and Pension
Act (Teachers' Act) provides in part that:
 "All pensions, annuities, refunds, or death
 benefits granted under the provisions of this
 Article are exempt from State and municipal
 taxes and are exempt from attachment or gar-
 nishment process. They shall not be seized or
 levied upon by virtue of any judgment or any
 process or proceedings issued out of or by any
 court for the payment or satisfaction in whole
 or in part of any debt, claim, damage, demand
 or judgment." 40 ILCS 5/17-151 (West 1994). 
Gerald claims that the judgment indirectly attaches or garnishes
his pension in violation of the statute. Although there is no
case interpreting this section of the Teachers' Act, there are
cases addressing similar anti-attachment provisions of public
pension statutes.
 In In re Marriage of Papeck, 95 Ill. App 3d 624, 420 N.E.2d
528 (1981), the trial court ordered the Retirement Board Firemen's
Annuity and Benefit Fund to restore to a wife sums that she had
previously paid into the fund on behalf of her husband. This
court reversed, holding that the trial court was precluded from
entering such an order by a statute similar to section 17-151 of
the Teachers' Act. See Papeck, 95 Ill. App 3d at 627, 420 N.E.2d
at 529.
 The Papeck court, however, stated as follows:
 "We are not suggesting that petitioner has no
 right to recover the money directly from her
 former husband. We hold, however, that the
 claim she asserts against the fund itself is
 barred by [statute]; in substance, it is the
 claim of a creditor.
 "We caution that our holding is not to be
 construed as affecting the rights of nonem-
 ployee spouses to receive a proportion of
 their husband's pension benefits as part of
 the marital property. * * * The spouse of
 the plan participant, upon dissolution of the
 marriage, obtains an actual co-ownership in-
 terest in the benefits as marital property. 
 Thus a divorced wife is not in the position of
 a mere 'creditor,' and the anti-attachment
 provision of the [statute] does not bar her
 claim to a certain proportion of the bene-
 fits."
Papeck, 95 Ill. App 3d at 629-30, 420 N.E.2d at 531-32. 
 In In re Marriage of Hackett, 113 Ill. 2d 286, 292-93, 497
N.E.2d 1152, 1155 (1986), our supreme court held that a fire-
fighter's pension benefits may be divisible as marital property
and that the pension statute did not supersede the provisions of
section 503 of the Illinois Marriage and Dissolution of Marriage
Act. Notably, the Hackett court stated that the legislative
intent behind one of the pension anti-attachment statutes was to
protect retired firefighters and their beneficiaries from cred-
itors. Hackett, 113 Ill. 2d at 292, 497 N.E.2d at 1155.
 In In re Marriage of Roehn, 216 Ill. App. 3d 891, 576 N.E.2d
560 (1991), relying on Papeck, this court concluded that the
governmental pension benefits at issue could be paid from the
pension fund, through the pensioned employee, and then to the non-
employee former spouse. Roehn, 216 Ill. App. 3d at 894-95, 576
N.E.2d at 562-63. In In re Marriage of Carlson, 269 Ill. App. 3d
464, 470, 646 N.E.2d 321, 326 (1995), this court affirmed an
agreed order under which the firefighters' pension fund agreed to
mail the divorcing wife's share of the pension directly to her.
 In this case, the judgment is similar to the "triangular"
arrangement approved in Roehn. The judgment does not make a
direct monetary claim on the Fund. Mildred's claim is also as co-
owner of marital property, not as a creditor.
 This case differs from Roehn insofar as the role given to the
Bank and the injunction against Gerald changing the Bank as the
depository for Fund payments. The record in this case shows that
Gerald willfully failed to comply with the trial court's initial
order regarding temporary maintenance and twice attempted to
change the depository in direct contravention of later trial court
orders. The record shows that Gerald had previously failed to
comply with the trial court's order that Gerald provide an address
at which service of notice could be had upon him. In addition,
this case is concerned with funds deposited into Gerald's account
at the Bank. Given this record, the trial court did not abuse its
discretion in entering these provisions of the judgment to ensure
that Gerald would comply with a proper order that he pay mainte-
nance.
 Paragraphs 12(e) and 13 of the judgment, however, are another
matter. These paragraphs require the Fund to give Mildred notice
of any request by Gerald to alter the depository of his pension
payments and written notice of any cost of living adjustment in
the pension payments. However, under Illinois law, the Fund is
not an individual or municipal corporation, but merely an aggrega-
tion of assets; there is no statutory provision for the Fund to
sue or be sued. See 40 ILCS 5/17-101 et seq. (West 1996);
Quinones v. City of Evanston, 829 F. Supp. 237, 241 (N.D. Ill.
1993). Thus, the Fund itself is not amenable to suit. According-
ly, we reverse paragraphs 12(e) and 13 of the judgment.
 II
 Gerald also argues that the trial court abused its discretion
in awarding any maintenance. A trial court has wide discretion in
awarding maintenance, taking into consideration such factors as
the circumstances of the parties, the standard of living during
the marriage, the duration of the marriage and the social position
of the spouse seeking maintenance. The trial court's determina-
tion is presumed to be correct. In re Marriage of Kristie, 156
Ill. App. 3d 821, 822, 510 N.E.2d 14, 14 (1987).
 Gerald first contends that the trial court failed to consider
his ability to pay maintenance. When a spouse pleads an inability
to pay, something more than a copy of a tax return may be neces-
sary to establish a preponderance of such evidence. See In re
Marriage of McDonald, 113 Ill. App. 3d 116, 118, 446 N.E.2d 559,
561 (1983). In this case, the record shows that Gerald did not
file tax returns for tax years 1991-95. The trial court had only
Gerald's testimony on his recent income. 
 Assuming arguendo that Gerald's testimony regarding his
income was given full weight, the record indicates that Gerald had
a monthly income of approximately $2,550. The record shows that
Mildred had a monthly income of approximately $300. Mildred
testified to monthly expenses exceeding $900, including the
mortgage she will continue to pay as owner of the condominium. 
Gerald did not cite any testimony regarding his typical monthly
expenses, though he testified regarding expenses for business
licenses, health club memberships and travel. 
 Moreover, Mildred had been treated for cancer and was re-
quired to continue medication as part of her treatment. Mildred's
job history was largely one of being dismissed from clerical and
retail sales positions after relatively short periods of time. 
Mildred's testimony also shows the decline in her standard of
living. Given this record, the trial court did not abuse its
discretion. See, e.g., In re Marriage of Trull, 254 Ill. App. 3d
34, 43, 626 N.E.2d 252, 259 (1993).
 Gerald maintains that the trial court ignored the antenuptial
agreement. This court will uphold a valid antenuptial agreement
which, by its terms, bars maintenance. E.g., In re Marriage of
Burgess, 138 Ill. App. 3d 13, 485 N.E.2d 504 (1985). Neither
party here contests the validity of their Agreement. Gerald
concedes in his brief that the Agreement does not expressly bar
maintenance, but notes that the Agreement states that Mildred
shall not acquire legal rights to Gerald's "property or the income
thereof" in the event of a divorce.
 The Agreement also provides that
 "Nothing in this agreement shall be con-
 strued to preclude the parties hereto from
 taking title to any after acquired real or
 personal property in Joint tenancy with the
 right of survivorship or tenants in common
 should they mutually agree so to do. In this
 event such property shall be excluded from the
 purview and contemplation of this agreement."
As noted above, Illinois law holds that Mildred is a co-owner of
the pension benefits to the extent of contributions made during
the marriage. The record shows that Gerald began contributions in
1952, married Mildred in 1972, and retired in 1982 or 1983. Thus,
approximately one-third of the benefits are deemed to be co-owned
by Mildred. The award of maintenance appears to reflect this
division. Accordingly, the trial court did not abuse its discre-
tion.
 III
 Finally, Gerald argues that the trial court abused its dis-
cretion in awarding attorney fees. Although neither party has a
large income, Gerald's larger income and the fact that Mildred
incurred costs due to Gerald's failure to comply with trial court
orders supports the trial court's award of $8,000 in fees. See,
e.g., In re Marriage of Uehlein, 265 Ill. App. 3d 1080, 638 N.E.2d
706 (1994). 
 The prospective award of one-third of fees incurred by
Mildred in defending this appeal is another matter. The party
seeking an award of prospective attorney fees should request fees
in a specific amount and present evidence in support of the need
and propriety of that amount of fees. In re Marriage of Brent,
263 Ill. App. 3d 916, 929, 635 N.E.2d 1382, 1391 (1994). In this
case, the trial court entered an award that was indefinite and not
based on the need and propriety of a particular amount of fees. 
This portion of the fee award must be reversed as contrary to law.
 For all of the aforementioned reasons, the judgment of
dissolution entered by the circuit court of Cook County is af-
firmed in part and reversed in part. The order awarding attorney
fees is also affirmed in part and reversed in part, in accordance
with this opinion.
 Affirmed in part, reversed in part.
 BUCKLEY, J., and GALLAGHER, J., concur.