*In re* MARRIAGE OF MILDRED KRANE, Petitioner-Appellee, and GERALD KRANE, Respondent-Appellant.

First District (1st Division)   Nos. 1—95—1705, 1—95—2993 cons.

Opinion filed May 19, 1997.

Jerome Marvin Kaplan and Jerome Berkson, both of Chicago, for appellant.

Davis, Friedman, Zavett, Kane & MacRae, of Chicago (Norah M. Plante, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Respondent Gerald Krane appeals from orders of the circuit court of Cook County dissolving his marriage to petitioner Mildred Krane and ordering him to pay maintenance and a portion of Mildred's attorney fees.

The record on appeal indicates that Mildred filed a petition for dissolution of marriage on June 6, 1991. On September 24, 1991, Mildred filed a petition for temporary maintenance, alleging that Gerald vacated the marital premises during May 1991 and had not paid her for household expenses, including the mortgage and assess-

ments. On October 18, 1991, the trial court entered an agreed order regarding payments for the mortgage and expenses through December 1, 1991, and continuing the petition for temporary maintenance.

On December 23, 1991, Mildred filed a petition for a rule to show cause, alleging that Gerald had willfully failed to comply with the prior agreed order. On January 23, 1992, the trial court: found Gerald in default on both petitions for failure to appear; ordered Gerald to pay Mildred temporary maintenance of $1,750 per month; stated that an order of withholding would issue against all of Gerald's payors; and entered a rule to show cause returnable on Mildred's motion.

On February 3, 1992, Mildred filed a petition for a temporary restraining order and other relief (TRO petition). Mildred alleged that she attempted to serve the trial court's order for withholding on the Public School Teachers' Pension and Retirement Fund of Chicago (Fund), because Gerald is a retired teacher whose primary source of income is retirement benefits. The Fund declined to comply with the order for withholding. The Fund payments were being directly deposited into Gerald's account at the Affiliated Bank (Bank) in Chicago. Mildred feared that Gerald would remove these funds to defeat her right to maintenance, based on Gerald's prior noncompliance and alleged failure to inform Mildred of his location or to support her during the marriage. The trial court restrained Gerald from changing the Bank as the depository for the Fund payments and from transferring, withdrawing, or disbursing any Fund payments.

On February 11, 1992, Mildred moved to add the Fund and the Bank as third-party defendants. Mildred also moved for turnover of funds from Gerald's account at the Bank in the amount of $1,750 per month. The trial court granted these motions, except for one payment. The trial court also ordered the Fund to notify Mildred's counsel of any request by Gerald to alter the depository of his benefits or for direct payment.

On March 3, 1992, Mildred filed another TRO petition, alleging that she received a February 27, 1992, letter from the Fund stating that Gerald had requested that his monthly payment be directed to a new address. The trial court again enjoined Gerald from changing the Bank as the depository for the Fund payments. On March 12, 1992, the trial court entered a similar preliminary injunction against Gerald.

On March 25, 1992, Mildred again moved for default, based on Gerald's failure to appear since October 18, 1991, and his failure to comply with the trial court's order that he provide an address at which service of notice could be had upon him. Mildred also filed an-

other TRO petition, alleging that she was notified by the Bank that on or about April 6, 1992, a person identifying himself as Gerald telephoned the Bank, seeking to close his account so that his Fund payments could be deposited at a new location. On April 9, 1992, the trial court entered an order of default and an order restraining Gerald from closing the Bank account or seeking to transfer monies from the account. The trial court also ordered the Bank account frozen, except for sums to be paid to Mildred under the prior court order.

Gerald entered an appearance by counsel on May 4, 1992. On June 18, 1992, the trial court entered an agreed order reducing maintenance to $1,189.63. Mildred would receive $591.81 from the Bank, approximately one-third of each Fund payment.

The trial court began hearing Mildred's petition on April 6, 1994. Mildred was born on July 5, 1926. She was a high school graduate with one year of junior college. Mildred first married on September 15, 1954, and had three children from that marriage. Mildred's first husband passed away in March 1970. Mildred met Gerald in 1971.

Gerald was born on April 25, 1925. Gerald had master's degrees in music and education. He began teaching part-time in the Chicago public schools in 1949 or 1950, which led to the full-time position he held when he met Mildred. Gerald began contributing to his pension in 1952 and retired in 1982 or 1983. Gerald was also employed by RMC Realty from 1971 or 1972 through 1987. Gerald then sold real estate franchises for the ERA Corporation through 1990. Gerald testified that his real estate license had lapsed, but his license to sell insurance was current. Gerald also made $200 to $250 weekly for approximately half of 1991, selling organs for Fletcher Music in Florida.

On March 2, 1972, Mildred and Gerald entered into an antenuptial agreement (Agreement) drafted by Mildred's attorney. The Agreement provided in part as follows:

"2. That if [Mildred] shall survive [Gerald], or in the event of a divorce, the husband or wife under no circumstance shall acquire any legal rights to any of the property or the income thereof as a result of the marriage; separation or otherwise, [Mildred] shall not, as surviving wife, make any claim to any part of the property or estate of which [Gerald] may own or die seized or possessed; and [Mildred], in consideration of said marriage, hereby expressly waives and relinquishes all right in and to the real and personal property of which [Gerald] may own or die seized, as well as all right in and to the personal estate of [Gerald], including Surviving Spouse's Award, whether as surviving wife, heir at law, or otherwise."

Exhibits attached to the Agreement listed the assets of Mildred and Gerald. Mildred's assets and liabilities included a checking account, various savings certificates and securities, insurance, a residence, an automobile, the assets of a trust established by her first husband, and the net assets of the first husband's estate. Mildred had net assets of approximately $417,500. Gerald's assets included pension contributions (then valued at $12,000), a checking account, and an automobile, resulting in total assets of $12,800.

Mildred and Gerald married on March 5, 1972. They lived in Mildred's home in Lincolnwood from 1972 to 1976. Gerald made minimal contributions toward the expenses of the home. Mildred sold her home in 1976.

Mildred then bought a residence on Lake Shore Drive. Gerald did not move into this residence for approximately 3½ years. Mildred again testified that Gerald contributed very little toward the expenses of the home. Gerald never paid the mortgage, taxes or assessments on the property.

Gerald moved out of the Lake Shore Drive residence in 1982. Mildred testified that Gerald moved into an apartment in Des Plaines with another woman and an apartment in Skokie with yet another woman. Mildred sold the Lake Shore Drive residence in 1983 because she could not afford to keep it. Mildred moved into her mother's one-bedroom apartment, sleeping on the couch.

In 1986, Mildred moved into her own apartment. In 1989, Gerald moved into Mildred's apartment. Gerald paid the rent and some of the household expenses. Both Mildred and Gerald put up money in 1990 to buy the apartment when it converted to a condominium. Gerald made contributions towards the mortgage and household expenses and paid assessments. However, approximately six months after purchasing the condominium, Gerald moved out. Mildred testified that Gerald moved in with the woman named Pamela, with whom he had allegedly lived in Des Plaines; Gerald denied this. Mildred further testified that approximately six months after Gerald moved out, he disappeared.

Gerald testified that he dated Pamela in 1989 and 1990 and possibly in 1991 and 1992 as well. Gerald testified that he assisted Pamela in applying for a discounted membership at his health club under the name "Pamela Krane."

Mildred testified that she did not have any special job skills. She worked as a receptionist for a few months in 1971 but did not work outside the home again until 1983. With the exception of five years she spent with the Howell Foundation at Northwestern University, Mildred went through a series of jobs where she did clerical work or

retail sales. Mildred was dismissed from her job with the Howell Foundation when it converted to computers, with which Mildred lacked experience.

Mildred later found a weekend job showing apartments for a real estate management company. In October 1993, she took a better real estate job with the Realview Towers in Northbrook, which paid $9 an hour. Mildred began working part-time but eventually worked 26 hours per week. When Realview Towers presented her with medical benefits, Mildred informed her employer that she had finished radiation treatment for cancer a few weeks earlier. Mildred testified that she was fired from this job a week prior to her testimony. Mildred explained that she tired easily and that it was sometimes difficult for her to concentrate. Her hours were reduced to 12 per week prior to her dismissal, as Mildred missed time due to the divorce proceedings.

Mildred was also asked about the disposition of the assets listed in the antenuptial agreement. Mildred testified regarding the sale and purchase of her various residences during the marriage. According to Mildred, she had spent funds she received from her first husband's estate for living expenses. Mildred also testified to sums she gave to her children over the years.

Mildred testified that a trust listed with assets of approximately $49,000 and receivables of approximately $3,800 was established by her first husband's will for the benefit of their children. Mildred also testified that, in 1977, she established another trust with funds from the sale of her house and other sources, but there was approximately $50 in that trust at the time of her testimony.

Mildred further testified that she had approximately $6,000 in a money market account and $1,000 in a checking account. Mildred stated that she owned stock in an entity called Safe Card she valued at approximately $8,000. According to Mildred, she had just begun receiving $54 in weekly unemployment compensation payments, though some of that payment was deducted because she received social security payments.

Based on an exhibit regarding her expenses covering a number of years of her marriage, Mildred testified that in each year of the marriage her expenses exceeded her income. Mildred testified that she was then receiving approximately $1,205 from the pension and a net payment of $260 from social security, with no other source of income. The reference to the pension appears to refer to the maintenance payments, as Mildred testified that she had no retirement account or pension income.

Mildred testified that she paid $641 monthly for the mortgage and real estate taxes on the condominium. Mildred also paid a

$212.20 monthly assessment. Mildred spent approximately $250 on groceries and $10 on laundry and dry cleaning. Mildred also had utility bills, which were not itemized in the testimony. Mildred testified that there were a number of items listed on the expense affidavit that she could no longer afford, including meals at restaurants and grooming at a beauty parlor or barber shop; Mildred had not had a professional haircut for three or four years. Mildred no longer made a car payment, but she testified that her car was a 1987 model, that she experienced problems with the car and that it might need to be replaced in the next year.

Gerald testified that, from July 1992 through May 1993, he received food, shelter and some medical services from an entity called the ARK. Gerald testified that he had no place to live and was destitute at the time. Gerald later testified that he had been residing with his sister for approximately one year.

Gerald was questioned about an account at the Bank of Lincolnwood in the name of Gerald Krane and Jean Honoroff. This account listed Ms. Honoroff's home and business addresses; Gerald gave a post office box address. Honoroff had known Gerald for 26 years. Honoroff stated that she and Gerald were girlfriend and boyfriend. Honoroff opened the joint bank account in December 1992 because she wanted Gerald to have some of his own money. According to Honoroff, the account is attributed to her for tax purposes, but she never deposited or withdrew funds from the account. Gerald testified that there was approximately $78 in the account. Gerald also testified that he had maintained a joint bank account in Florida with his son but that his son never deposited any money into the account.

Gerald testified that he was receiving approximately $1,800 monthly on his teacher's pension and approximately $439 from social security. Although Gerald was married to Mildred when he retired, he waived survivor benefits and received a $5,000 payment in exchange.

Although Gerald testified that he had not sold insurance in 20 or 30 years, he admitted he had "a part of a company" called the Gibraltar Insurance Agency (Gibraltar). Gerald testified that he did not know where Gibraltar was located but stated that it "might be" in the same office as Richard Bradley and Associates. Jean Honoroff had owned Richard Bradley and Associates, an insurance and financial planning business, since 1959. Gerald testified that Gibraltar also had been owned by Honoroff, but he did not think that she currently owned it. Gerald denied that he was employed by Gibraltar.

Honoroff testified that, in February 1995, she and Gerald had

spent a month in Germany. Honoroff paid for the trip. Gerald also testified that, in 1993, he travelled to Florida, California, New York, New Jersey, San Antonio and Boston. Gerald paid for the trip to California, but he did not recall the cost of the trip and had no documents that would show the cost. Honoroff or her company paid for the remaining 1993 trips, which apparently were related to business conventions. In 1991, Gerald had travelled to Wisconsin and San Diego.

Gerald was questioned regarding his tax records. Gerald testified that his 1989 federal income tax return listed income of $45,350. A W-2 form attached to the Kranes' 1990 joint tax return listed Gerald's wages as $28,802.55; the return listed pension income of $21,943. Gerald testified that his 1991 federal income tax return listed income of $42,044. Gerald did not file tax returns for tax years 1991-95.

Both parties testified that family members had loaned them thousands of dollars in the recent past.

Following the submission of written closing arguments, the trial court filed its decision on December 1, 1994. The decision awarded Mildred exclusive ownership and possession of the condominium and $800 monthly in permanent maintenance. On December 30, 1994, Mildred filed a motion to reconsider which, in relevant part, sought a larger maintenance payment and an automatic 3% annual increase in maintenance to correspond with an automatic 3% annual increase in Gerald's pension payments. Gerald filed a response, taking issue with various aspects of the trial court decision.

On April 10, 1995, the trial court entered the judgment for dissolution of marriage. The judgment recites that Mildred was unemployed at the time of trial and that her only income other than maintenance was a monthly social security payment of approximately $300. The judgment also recites that Gerald received a monthly pension payment from the Fund of approximately $2,100 and monthly social security benefits of approximately $450. The judgment increased the permanent monthly maintenance payment to $824—a 3% increase—and provided that the payments would increase annually, commensurate with any increase in the pension payments. The judgment also included terms similar to the trial court's prior orders that the Fund would deposit Gerald's pension into his account at the Bank, which would then remit the maintenance to Mildred and the remainder to Gerald. The judgment further included terms similar to the trial court's prior orders enjoining Gerald from changing the Bank as the designated depository for payments from the Fund and requiring the Fund to notify Mildred of any attempt by Gerald to change the designated depository.

Also on April 10, 1995, Mildred filed a petition for attorney fees. Gerald filed a notice of appeal to this court. Mildred then filed a petition for prospective attorney fees regarding the appeal. On August 16, 1995, the trial court awarded Mildred's counsel $8,000 in fees and one-third of any costs incurred in any appellate court proceedings[1]. Gerald filed a timely second notice of appeal.

# I

■ Gerald initially maintains that the trial court erred in ordering the method by which Mildred would receive the maintenance payments, including enjoining Gerald from changing the Bank as designated depository for the Fund pension payments. Gerald argues that the judgment is an illegal attachment of the Fund payments. Section 17—151 of the Illinois Pension Code (Teachers' Retirement and Pension Act or Teachers' Act) provides in part:

> "All pensions, annuities, refunds, or death benefits granted under the provisions of this Article are exempt from State and municipal taxes and are exempt from attachment or garnishment process. They shall not be seized or levied upon by virtue of any judgment or any process or proceedings issued out of or by any court for the payment or satisfaction in whole or in part of any debt, claim, damage, demand or judgment." 40 ILCS 5/17—151 (West 1994).

Gerald claims that the judgment indirectly attaches or garnishes his pension in violation of the statute. Although there is no case interpreting this section of the Teachers' Act, there are cases addressing similar anti-attachment provisions of public pension statutes.

In *In re Marriage of Papeck*, 95 Ill. App. 3d 624, 420 N.E.2d 528 (1981), the trial court ordered the retirement board firemen's annuity and benefit fund to restore to a wife sums that she had previously paid into the fund on behalf of her husband. This court reversed, holding that the trial court was precluded from entering such an order by a statute similar to section 17—151 of the Teachers' Act. See *Papeck*, 95 Ill. App. 3d at 627, 420 N.E.2d at 529.

The *Papeck* court, however, stated as follows:

> "We are not suggesting that petitioner has no right to recover the money directly from her former husband. We hold, however, that the claim she asserts against the fund itself is barred by [statute]; in substance, it is the claim of a creditor.
>
> We caution that our holding is not to be construed as affecting the rights of nonemployee spouses to receive a proportion of their

---

[1]Gerald was represented by counsel without charge in the trial court.

husband's pension benefits as part of the marital property. \*\*\* The spouse of the plan participant, upon dissolution of the marriage, obtains an actual co-ownership interest in the benefits as marital property. Thus a divorced wife is not in the position of a mere 'creditor,' and the anti-attachment provision of the [statute] does not bar her claim to a certain proportion of the benefits." *Papeck*, 95 Ill. App. 3d at 629, 420 N.E.2d at 531-32.

In *In re Marriage of Hackett*, 113 Ill. 2d 286, 292-93, 497 N.E.2d 1152, 1155 (1986), our supreme court held that a firefighter's pension benefits may be divisible as marital property and that the pension statute did not supersede the provisions of section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 503). Notably, the *Hackett* court stated that the legislative intent behind one of the pension anti-attachment statutes was to protect retired firefighters and their beneficiaries from creditors. *Hackett*, 113 Ill. 2d at 292, 497 N.E.2d at 1155.

In *In re Marriage of Roehn*, 216 Ill. App. 3d 891, 576 N.E.2d 560 (1991), relying on *Papeck*, this court concluded that the governmental pension benefits at issue could be paid from the pension fund, through the pensioned employee, and then to the nonemployee former spouse. *Roehn*, 216 Ill. App. 3d at 894-95, 576 N.E.2d at 562-63. In *In re Marriage of Carlson*, 269 Ill. App. 3d 464, 470, 646 N.E.2d 321, 326 (1995), this court affirmed an agreed order under which the firefighters' pension fund agreed to mail the divorcing wife's share of the pension directly to her.

In this case, the judgment is similar to the "triangular" arrangement approved in *Roehn*. The judgment does not make a direct monetary claim on the Fund. Mildred's claim is also as co-owner of marital property, not as a creditor.

■ This case differs from *Roehn* insofar as the role given to the Bank and the injunction against Gerald changing the Bank as the depository for Fund payments. The record in this case shows that Gerald willfully failed to comply with the trial court's initial order regarding temporary maintenance and twice attempted to change the depository in direct contravention of later trial court orders. The record shows that Gerald had previously failed to comply with the trial court's order that Gerald provide an address at which service of notice could be had upon him. In addition, this case is concerned with funds deposited into *Gerald's account* at the Bank. Given this record, the trial court did not abuse its discretion in entering these provisions of the judgment to ensure that Gerald would comply with a proper order that *he* pay maintenance.

■ Paragraphs 12(e) and 13 of the judgment, however, are an-

other matter. These paragraphs require the Fund to give Mildred notice of any request by Gerald to alter the depository of his pension payments and written notice of any cost of living adjustment in the pension payments. However, under Illinois law, the Fund is not an individual or municipal corporation, but merely an aggregation of assets; there is no statutory provision for the Fund to sue or be sued. See 40 ILCS 5/17—101 *et seq.* (West 1996); *Quinones v. City of Evanston*, 829 F. Supp. 237, 241 (N.D. Ill. 1993). Thus, the Fund itself is not amenable to suit. Accordingly, we reverse paragraphs 12(e) and 13 of the judgment.

## II

■ Gerald also argues that the trial court abused its discretion in awarding any maintenance. A trial court has wide discretion in awarding maintenance, taking into consideration such factors as the circumstances of the parties, the standard of living during the marriage, the duration of the marriage and the social position of the spouse seeking maintenance. The trial court's determination is presumed to be correct. *In re Marriage of Kristie*, 156 Ill. App. 3d 821, 822, 510 N.E.2d 14, 14 (1987).

■ Gerald first contends that the trial court failed to consider his ability to pay maintenance. When a spouse pleads an inability to pay, something more than a copy of a tax return may be necessary to establish a preponderance of such evidence. See *In re Marriage of McDonald*, 113 Ill. App. 3d 116, 118, 446 N.E.2d 559, 561 (1983). In this case, the record shows that Gerald did not file tax returns for tax years 1991-95. The trial court had only Gerald's testimony on his recent income.

Assuming *arguendo* that Gerald's testimony regarding his income was given full weight, the record indicates that Gerald had a monthly income of approximately $2,550. The record shows that Mildred had a monthly income of approximately $300. Mildred testified to monthly expenses exceeding $900, including the mortgage she will continue to pay as owner of the condominium. Gerald did not cite any testimony regarding his typical monthly expenses, though he testified regarding expenses for business licenses, health club memberships and travel.

Moreover, Mildred had been treated for cancer and was required to continue medication as part of her treatment. Mildred's job history was largely one of being dismissed from clerical and retail sales positions after relatively short periods of time. Mildred's testimony also shows the decline in her standard of living. Given this record, the trial court did not abuse its discretion. See, *e.g., In re Marriage of Trull*, 254 Ill. App. 3d 34, 43, 626 N.E.2d 252, 259 (1993).

■ Gerald maintains that the trial court ignored the antenuptial agreement. This court will uphold a valid antenuptial agreement which, by its terms, bars maintenance. *E.g., In re Marriage of Burgess,* 138 Ill. App. 3d 13, 485 N.E.2d 504 (1985). Neither party here contests the validity of their Agreement. Gerald concedes in his brief that the Agreement does not expressly bar maintenance, but notes that the Agreement states that Mildred shall not acquire legal rights to Gerald's "property or the income thereof" in the event of a divorce.

The Agreement also provides:

> "Nothing in this agreement shall be construed to preclude the parties hereto from taking title to any after acquired real or personal property in Joint tenancy with the right of survivorship or tenants in common should they mutually agree so to do. In this event such property shall be excluded from the purview and contemplation of this agreement."

As noted above, Illinois law holds that Mildred is a co-owner of the pension benefits to the extent of contributions made during the marriage. The record shows that Gerald began contributions in 1952, married Mildred in 1972, and retired in 1982 or 1983. Thus, approximately one-third of the benefits are deemed to be co-owned by Mildred. The award of maintenance appears to reflect this division. Accordingly, the trial court did not abuse its discretion.

## III

■ Finally, Gerald argues that the trial court abused its discretion in awarding attorney fees. Although neither party has a large income, Gerald's larger income and the fact that Mildred incurred costs due to Gerald's failure to comply with trial court orders supports the trial court's award of $8,000 in fees. See, *e.g., In re Marriage of Uehlein,* 265 Ill. App. 3d 1080, 638 N.E.2d 706 (1994).

■ The prospective award of one-third of fees incurred by Mildred in defending this appeal is another matter. The party seeking an award of prospective attorney fees should request fees in a specific amount and present evidence in support of the need and propriety of that amount of fees. *In re Marriage of Brent,* 263 Ill. App. 3d 916, 929, 635 N.E.2d 1382, 1391 (1994). In this case, the trial court entered an award that was indefinite and not based on the need and propriety of a particular amount of fees. This portion of the fee award must be reversed as contrary to law. .

For all of the aforementioned reasons, the judgment of dissolution entered by the circuit court of Cook County is affirmed in part

620

and reversed in part. The order awarding attorney fees is also affirmed in part and reversed in part, in accordance with this opinion.

Affirmed in part; reversed in part.

BUCKLEY and GALLAGHER, JJ., concur.