(No. 88352.—

DELORES SMITHBERG, Appellant, v. THE IL-
LINOIS MUNICIPAL RETIREMENT FUND *et al.*,
Appellees.

*Opinion filed August 10, 2000.*

Gwendolyn J. Sterk, of Goldstine, Skrodzki, Russian,
Nemec & Hoff, Ltd., of Burr Ridge, for appellant.

Robert S. Krockey, Timothy A. Clark and G. Scott
Pyles, of Block, Krockey, Cernugel & Cowgill, P.C., of Jo-
liet, and David M. Jaffe, of the Law Offices of Jaffe,
O'Connor, Cunnington, Burnett & Shapiro, of Kankakee,
for appellee Nancy Smithberg.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

The ultimate issue to be resolved in this case concerns entitlement to the Illinois Municipal Retirement Fund (IMRF) death benefit of James Smithberg. Following James' death, competing claims were filed with the IMRF for James' death benefit: one by James' first wife, Nancy Smithberg; another by his second wife, Delores Smithberg, to whom he was married at the time of his death. Upon receiving notice from the IMRF that it would not pay the death benefit "without an agreement between the claimants or direction from a court," Delores filed a complaint against the IMRF seeking a declaratory judgment that she is the rightful beneficiary. The IMRF answered and interpleaded the death benefit between Delores and Nancy. Nancy answered and filed a counter-complaint for declaratory judgment, seeking to establish *her* right to the death benefit. On cross-motions for summary judgment, the trial court ruled that Delores is the rightful beneficiary of the death benefit. Nancy's notice of appeal was timely filed on December 9, 1998.

On appeal, applying equitable principles, the appellate court reversed and remanded with directions that summary judgment be entered in favor of Nancy. 306 Ill. App. 3d 1139. We granted Delores' leave to appeal (177 Ill. 2d R. 315) and now affirm the judgment of the appellate court. The following facts are relevant to our disposition.

On August 1, 1996, a judgment of dissolution of marriage was entered in the circuit court of Cook County dissolving the 33-year marriage of James and Nancy Smithberg. Through their marital settlement agreement, which was approved by the court and incorporated in the judgment for dissolution, James and Nancy sought to "settle between themselves *** issues relating to their respective rights of property *** whether now or later

owned or possessed by either of them." They acknowledged they had "freely and voluntarily entered into [the] agreement, free of any duress or coercion and with full knowledge of each and every provision contained in [the] agreement, and the consequences thereof." As part of the agreement, and in exchange for her waiver of any right or claim to other retirement benefits belonging to James, it was agreed that Nancy would be "listed as the recipient of any benefits payable upon the death of" James from the IMRF, and that he would "not designate any other survivors, or allocate any survivorship benefits, to anyone other than" Nancy.

Subsequently, on a date not disclosed in the record, James remarried and, contrary to the express terms of the judgment and marital settlement agreement, designated his second wife, Delores, as the recipient of his IMRF death benefit. Upon learning of James' action, Nancy filed an emergency petition for rule to show cause why James should not be held in contempt for his willful violation of the judgment of dissolution. The petition was designated an "emergency" petition, because James was believed to be "seriously ill" at the time. Affidavits and exhibits subsequently presented in this case show that hearing on the petition was postponed and continued by agreement on February 19, 1998, due to certain representations made on, and perhaps before, February 18, 1998, by James' attorney, Raymond Meader. It appears from a letter of that date that Meader led Nancy's attorney, David Jaffe, to believe that James had agreed to do that which he was obligated to do pursuant to his original agreement and the judgment of dissolution: unconditionally designate Nancy as the beneficiary of his IMRF death benefits. In his letter, Meader indicated that he would ask James to sign the IMRF form naming Nancy as primary beneficiary and would then "forward to the Village of Romeoville [James' employer] for forwarding to IMRF."

On February 20, 1998, Meader obtained James' signature on the form, but was purportedly instructed by James "to make sure everything was resolved with regard to the Petition for Rule before finalizing the matter." Meader also claimed that James wanted to consider other benefit options before filing the designation with the IMRF, although it is not clear how, if at all, the designation of a beneficiary for death benefits would impact the availability of other benefits or why James believed he could choose *not* to file the beneficiary designation.

According to Meader's affidavit, he received a telephone call from attorney Jaffe on February 21, 1998, and on that date advised Jaffe that the form had been signed, but still needed to be completed. Pursuant to Jaffe's request, Meader faxed Jaffe a copy of the form, which bore James' signature and named Nancy as his beneficiary. Meader claimed he told Jaffe that he "needed a complete resolution of th[e] matter" including the issue of "attorney's fees and costs" claimed in Nancy's petition for rule to show cause. Meader's affidavit does not, however, specifically state that he informed Jaffe the form would not be sent to the IMRF *until* Nancy agreed to relinquish her claim for attorney fees and costs.

When Meader visited the offices of the City of Romeoville on February 24, 1998, he handed the designation of beneficiary form to Doris Mann, the village employee who handled IMRF matters, and told her not to process the document with the IMRF until he instructed her to do so.

James died in the early morning of February 25, 1998. The affidavit of Doris Mann indicates that, having received no further instruction, she remained in possession of the designation of beneficiary form until March of 1998, when the IMRF contacted her and requested it.

When the IMRF refused to pay the death benefit to

Delores barring an agreement between the competing claimants or "direction from a court," Delores sought a resolution of the matter in the circuit court. By interpleading the death benefit and requesting relief as the circuit court deemed "equitable," the IMRF itself implicitly acknowledged the authority of the circuit court to order the benefit paid directly to either claimant and agreed to pay the benefit to either party. The IMRF invoked in the process the panoply of judicial powers traditionally at a court's disposal and set the stage for redress of James' blatant wrongdoing as set forth in Nancy's pleadings and evinced in Delores' own affidavits. As will appear hereafter, there was no statutory or procedural impediment to a just result.

With that observation, we turn to our analysis and resolution of this case. Although the *ultimate* issue here concerns entitlement to James Smithberg's IMRF death benefit, the facts and arguments raise a broader, more troubling matter, specifically, a challenge to the power of a court in this context to enforce by equitable means a judgment based upon the incorporated terms of a marital settlement agreement effecting an agreed distribution of marital assets.

Clearly, James was obligated by the express terms of his agreement with Nancy to name her and no other as the beneficiary of his IMRF death benefit. The marital settlement agreement, which was incorporated in the court's judgment of dissolution, acknowledged that James had "freely and voluntarily entered into [the] agreement, free of any duress or coercion and with full knowledge of each and every provision contained in [the] agreement, and the consequences thereof." James agreed to name Nancy as the beneficiary of his IMRF death benefit in exchange for her waiver of any right or claim to certain *other* retirement benefits belonging to James, benefits, we might add, in which Nancy clearly would have had an interest in view of the parties' 33-year marriage.

It appears that James, at some point subsequent to the judgment of dissolution, designated Delores as the beneficiary of his death benefit. James' action was nothing less than an attempt to deprive Nancy of her vested substantive rights under the parties' marital settlement agreement and it constituted a clear violation of the court's judgment of dissolution. In response, Nancy filed an emergency petition for rule to show cause. Had the cause proceeded in the circuit court, James undoubtedly would have faced a finding of contempt of court; he would have been ordered to reinstate Nancy as the beneficiary of his death benefit; and he would have been required to pay Nancy's reasonable attorney fees pursuant to section 508(b) of the Illinois Marriage and Dissolution of Marriage Act. See 750 ILCS 5/508(b) (West 1998); *In re Marriage of Scott*, 286 Ill. App. 3d 1056, 1059 (1996).

James avoided that result only by means of an agreement to postpone the hearing on Nancy's petition. The resulting continuance was apparently achieved by either the representations, or misrepresentations, of his attorney to the effect that James would forthwith comply with the terms of his marital settlement agreement and the judgment of dissolution. However, after he had obtained the continuance of the hearing, James seems to have violated the latter agreement as well. Instead of unconditionally placing the form designating Nancy as beneficiary with the Village of Romeoville for forwarding to the IMRF, James' attorney, contrary to representations he made in a letter dated February 18, 1998, advised Doris Mann *not* to send the form on to the IMRF until instructed to do so upon the pretext that James wished to inquire about other IMRF benefits. Obviously, having obtained his continuance, James either wished to use the form as further leverage against Nancy's meritorious claim for attorney fees and costs or, realizing that his demise was imminent, he wanted to deprive Nancy of

the death benefit altogether. Since there is no indication in the record that James' estate *has* sufficient funds to compensate Nancy in the amount of the death benefit due her, it is speculative at best to suggest, as Delores *repeatedly* does, that Nancy's avenue of redress lies solely in a suit against James' estate. As the appellate court held, equity will regard as done that which ought to be done. 306 Ill. App. 3d at 1143.

Equity is defined as follows:

> "Justice administered according to fairness as contrasted with the strictly formulated rules of common law. *** The term 'equity' denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men with men." Black's Law Dictionary 540 (6th ed. 1990).

Those principles should serve as a beacon to any court charting a course through conflicting case authorities, and we believe they are particularly apt in the resolution of this case.

Delores argues for a strict application of section 7—118 of the Illinois Pension Code (Code) (40 ILCS 5/7—118 (West 1998) (definition of "beneficiary")), without regard to the attendant circumstances. Section 7—118(a) states that "[d]esignations of beneficiaries shall be in writing on forms prescribed by the board and effective upon filing in the fund offices." 40 ILCS 5/7—118(a) (West 1998). According to Delores, since section 7—118(b) allows for a change of beneficiary at any time (40 ILCS 5/7—118(b) (West 1998)), and since the form on file with the IMRF as of the date of James' death named *her* as the beneficiary of his death benefit, the Code compelled payment to her in spite of James' wrongdoing, and the court system is, in effect, powerless to right the wrong done Nancy. We disagree.

It is an elementary principle of law that a court is vested with the inherent power to enforce its orders. *In re Baker*, 71 Ill. 2d 480, 484 (1978). Where a domestic re-

lations order has been entered, the trial court retains jurisdiction to enforce its order (*In re Marriage of Hartman*, 305 Ill. App. 3d 338, 343 (1999)), as further performance by the parties is often contemplated (*In re Marriage of Adamson*, 308 Ill. App. 3d 759, 764 (1999)). In the case of the court that rendered James and Nancy's judgment of dissolution, jurisdiction was expressly retained for the purpose of enforcing all of its terms and conditions. Had James lived, there is no doubt that he could have been compelled by the use of contempt proceedings to abide by the terms of his marital settlement agreement as incorporated in the court's judgment. His death, however, does not leave the courts powerless to rectify his wrongdoing and enforce Nancy's right to the death benefit.

Irrespective of empowering statutes, a court retains its traditional equitable powers. Such inherent equitable power, derived from the historic power of equity courts, cannot be taken away or abridged by the legislature. *Marsh v. Illinois Racing Board*, 179 Ill. 2d 488, 495 (1997); *Ardt v. Illinois Department of Professional Regulation*, 154 Ill. 2d 138, 146 (1992). When the legislature encroaches upon a fundamentally judicial prerogative, this court has not hesitated to protect judicial authority. *Murneigh v. Gainer*, 177 Ill. 2d 287, 302-03 (1997); *People v. Joseph*, 113 Ill. 2d 36, 43 (1986).

Although the court's contempt power became useless with James' death as a means by which to enforce the judgment of dissolution, the circuit court in this case had equitable remedies at its disposal and should have employed them to afford Nancy relief. As the appellate court did, and as this court has previously done (*Cesena v. Du Page County*, 145 Ill. 2d 32, 38 (1991); *Ward v. Sampson*, 395 Ill. 353, 366-67 (1946)), the circuit court could have simply considered "that as done which ought to be done." In *Cesena*, this court invoked its equitable

powers and deemed an accident report filed as of the date and time that an attempt was made to file it. *Cesena*, 145 Ill. 2d at 38. In this case, the appellate court properly exercised its equitable powers and deemed the designation of beneficiary form filed with the IMRF when it should have been filed, prior to James' death.

Additionally, even had the death benefits been awarded to Delores, according to the beneficiary form on file with the IMRF as of the date of James' death, a constructive trust would have been imposed upon those death benefits. When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment. *Norton v. City of Chicago*, 293 Ill. App. 3d 620, 628 (1997); *Frederickson v. Blumenthal*, 271 Ill. App. 3d 738, 741 (1995); Restatement of Restitution § 160, Comment *c* (1937). Although some form of wrongdoing is generally required for the imposition of a constructive trust (*Suttles v. Vogel*, 126 Ill. 2d 186, 193 (1988)), wrongdoing is not always a necessary element (*Norton*, 293 Ill. App. 3d at 628; *Frederickson*, 271 Ill. App. 3d at 740-41). For example, a constructive trust may be imposed in the case of mistake, although no wrongdoing is involved. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 55 (1994); *Suttles*, 126 Ill. 2d at 193. Constructive trusts are appropriate remedies where one spouse has transferred property in fraud of the rights of another. Restatement of Restitution § 168, Comment *c* (1937).

A constructive trust is created when a court declares the party in possession of wrongfully acquired property the constructive trustee of that property because it would be inequitable for that party to retain possession of it. The sole duty of the constructive trustee is to transfer title and possession of the wrongfully acquired property to the beneficiary. *Suttles*, 126 Ill. 2d at 193; *Frederickson*, 271 Ill. App. 3d at 740.

Although the transaction challenged in a constructive trust case is usually one between the parties vying for the property in question, that relationship is not a prerequisite. *Roth v. Carlyle Real Estate Ltd. Partnership VII*, 129 Ill. App. 3d 433, 438-39 (1984). Except where a *bona fide* purchaser for value is concerned (*Frankel v. Otiswear, Inc.*, 216 Ill. App. 3d 204, 216 (1991)), a constructive trust may be imposed even though the person wrongfully receiving the benefit is innocent of collusion (*Brennan v. Persselli*, 353 Ill. 630, 636 (1933)). By accepting the property, he adopts the means by which it was procured. *Brennan*, 353 Ill. at 636; *Sadacca v. Monhart*, 128 Ill. App. 3d 250, 256-57 (1984).

Equitable relief, be it by constructive trust or some other form, has been frequently employed in situations very similar to the one now confronting us. In *Lincoln National Life Insurance Co. v. Watson*, 71 Ill. App. 3d 900 (1979), a property settlement agreement, incorporated into a divorce decree, required the husband to maintain a life insurance policy for the benefit of the parties' son. A policy was issued, but no one was ever named beneficiary, and a default provision presumed the insured's surviving spouse (he had remarried) to be the beneficiary. When the insured died and the insurance company was faced with competing claims, it filed an interpleader action to determine the rights of the rival claimants. Upon motions for summary judgment, the trial court directed payment to the son who should have been named beneficiary by the terms of the marital settlement agreement and divorce decree. The appellate court affirmed, noting that " 'equity regards as done that which ought to be done.' " *Lincoln National Insurance Co.*, 71 Ill. App. 3d at 902.

It has been generally held that, when marital settlement agreements require an insured to maintain life insurance for the benefit of a particular beneficiary, that

beneficiary has an enforceable equitable right to the proceeds of the insurance policies against any other named beneficiary except one with a superior equitable right. *In re Schwass*, 126 Ill. App. 3d 512, 514 (1984) (constructive trust imposed); *Appelman v. Appelman*, 87 Ill. App. 3d 749, 753-54 (1980) (constructive trust appropriate); *Brunnenmeyer v. Massachusetts Mutual Life Insurance Co.*, 66 Ill. App. 3d 315, 319 (1978) (remand with directions to insure that "equitable rights \*\*\* are protected"). The same result has obtained where the requirement is the result of the court's decree, rather than the parties' agreement. See *Perkins v. Stuemke*, 223 Ill. App. 3d 839, 846-47 (1992) (constructive trust imposed in the proceeds of a subsequent policy where the policy referred to in the judgment of dissolution had lapsed).

Delores argues that those cases are inapplicable to these facts simply because the requirement of beneficiary designation in this case pertained to a *public* pension fund, as opposed to private insurance or a private pension. She cites anti-alienation provisions of the Illinois Constitution of 1970 and the Code which she claims place public pension funds beyond the immediate reach of the courts, or at least did so prior to July 1, 1999, the effective date of a statute pertaining to "Qualified Illinois Domestic Relations Orders" (QILDROs) which purports to give domestic relations courts *limited* powers to effect distributions of public pension benefits through QILDROs directed to non-litigant pension funds. 40 ILCS 5/1—119 (West 1998). Before that legislation, no specific statutory authority in Illinois authorized a domestic relations court order directing payment of a governmental pension benefit to a person other than the regular payee. Although the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1001 *et seq.* (1994)) would have allowed for a Qualified Domestic Relations Order (QDRO) in this situation had James

been a member of a *private* pension plan, ERISA is not applicable to governmental pension funds (29 U.S.C. § 1003(b) (1994)).

We note in passing that Illinois' new QILDRO provision, among other things, states that a QILDRO will not apply to or affect "the payment of any survivor's benefit, death benefit, disability benefit, life insurance benefit, or health insurance benefit" (40 ILCS 5/1—119(b)(4) (West 1998)), unlike ERISA, which *would* allow for QDROs which affect survivorship benefits. 29 U.S.C. § 1056(d)(3)(F) (1994). Moreover, with regard to benefits subject to its terms, the new QILDRO provision would appear to require the consent of any member who began participating in the retirement system on or before the effective date of the enabling statute in order for a QILDRO to be effective (40 ILCS 5/1—119(m)(1) (West 1998)). We will not comment further on the wisdom or effect of this new legislation, as the parties do not contend that it controls the disposition of the case before us. It is not necessary, in this context, to delineate the extent to which the new statute has wrought a change in the law as it existed prior to July 1, 1999.

By the parties' marital settlement agreement, James consented and agreed to name Nancy, his wife of 33 years, as the sole recipient of his "survivorship benefit." Nancy obtained a vested, contingent right to those benefits when the marital settlement agreement was incorporated in the judgment of dissolution and that judgment became final. The death benefit is similar to a survivor benefit, which has been held to be a "distinct property interest" and, though contingent in nature (*In re Marriage of Moore*, 251 Ill. App. 3d 41, 44 (1993)), it, like any other property right created by a judgment of dissolution, becomes a vested right when the judgment is final (see *In re Marriage of Hubbard*, 215 Ill. App. 3d 113, 116 (1991)).

Although Delores argues that longstanding anti-alienation provisions of the Illinois Constitution and the Code prohibited any orders that required a public pension fund to pay benefits *directly* to the former spouse of a covered employee, she admits that retirement benefits have long been presumed to be marital property to the extent that the beneficial interest was acquired during the marriage. She could hardly argue otherwise, as that proposition has been so firmly established in this state over the years as to be beyond dispute. See *In re Marriage of Hackett*, 113 Ill. 2d 286, 292-93 (1986); *In re Marriage of Krane*, 288 Ill. App. 3d 608, 616-17 (1997); *In re Marriage of Carlson*, 269 Ill. App. 3d 464, 468-71 (1995); *Moore*, 251 Ill. App. 3d at 44-45; *In re Marriage of Roehn*, 216 Ill. App. 3d 891, 895 (1991); *In re Marriage of Papeck*, 95 Ill. App. 3d 624, 629 (1981). The 1999 amendment to section 503(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/503(b)(2) (West 1998)) now acknowledges as much.

Section 5 of article XIII of the Illinois Constitution of 1970 *does* provide that membership in a public pension fund shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired. Ill. Const. 1970, art. XIII, § 5. However, this court has construed that provision as a guarantee that all public pension benefits are to be determined under a contractual theory rather than being treated as mere gratuities as some pensions had been previously. *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 102 (1987).

The IMRF statute, like other statutes establishing public pension funds under the Code, also contains a provision broadly prohibiting alienation of benefits payable to participating employees. 40 ILCS 5/7—217 (West 1996). However, as noted, this court in *Hackett* held that the spouse of a public pension participant obtains an

actual ownership interest in the pension benefit as marital property. This court found no inconsistency between section 503 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, pars. 503(a), (b)) and a similar anti-alienation provision of the Code (Ill. Rev. Stat. 1983, ch. 108½, par. 4—135), observing as follows:

> "The purpose and the legislative intent of section 4—135 was to protect retired firemen and their beneficiaries from creditors. Considering the beneficial interest to be marital property does not conflict with that purpose; it provides for a division of the benefits between those individuals whom the statute was intended to protect." *Hackett*, 113 Ill. 2d at 292-93.

To be sure, in many cases pension benefits may constitute one of the most important items of property acquired in a marriage of long duration; in some perhaps, it may be the only asset of any significant value. To deprive a domestic relations court of the power to apportion the value of such a significant marital asset, and enforce that apportionment, would, in many cases, deprive the court of the ability to do justice between the parties. A court's authority to enforce its judgment, equitably apportioning marital assets, surely cannot be subordinate to the whims of one of the parties in the divorce proceeding or defeated by his or her blatant violation of the parties' agreement as incorporated in a judgment of dissolution. As we have demonstrated, courts are not powerless to enforce their judgments.

Although, as Delores notes, prior to passage of QILDRO provisions, some courts had interpreted anti-alienation provisions to preclude court orders requiring *direct* payments from a nonlitigant, public pension fund to a nonemployee, divorced spouse, regardless of the circumstances (see *Roehn*, 216 Ill. App. 3d at 894 (authorizing pension payments to go first to the member, *then* to the former spouse)), others considered such holdings er-

roneous interpretations, and unwarranted extensions, of statements made in *Papeck* in an entirely different context (see *Carlson*, 269 Ill. App. 3d at 469-72 (holding that pension funds could be ordered to pay the former spouse directly)).

In *Papeck*, the trial court ordered the Retirement Board Firemen's Annuity and Benefit Fund to restore to a wife her own *nonmarital* funds that she had previously paid into her husband's retirement fund on his behalf. As observed by the *Carlson* court, *Papeck* held only that former spouses who are *creditors* could not directly reach pension fund assets. The wife in *Papeck* sought to recover her own nonmarital property from the fund. She did *not* claim entitlement to pension benefits by virtue of her marital status. The *Papeck* court in fact attempted to clearly restrict the breadth of its holding, stating:

> "We caution that our holding is not to be construed as affecting the rights of nonemployee spouses to receive a portion of their husband's pension benefits as part of the marital property. *** The spouse of the plan participant, upon dissolution of the marriage, obtains an actual co-ownership interest in the benefits as marital property. Thus a divorced wife is not in the position of a mere 'creditor,' and the anti-attachment provision of the [statute] does not bar her claim to a certain proportion of the benefits." (Emphasis omitted.) *Papeck*, 95 Ill. App. 3d at 629-30.

Prior to the change in the law brought about by the QILDRO provisions, there was no statutory mechanism in place to implement provisions of the Illinois Marriage and Dissolution of Marriage Act and case authority which recognized as "marital property" a person's interest in his or her spouse's public pension benefits. To some extent, the decisions rendered during that period reflected the uncertainty. We do not criticize or condemn the results reached by the courts in those varied scenarios. We address only this case, and these facts.

In this case, no court has sought to reach out and impose its domestic relations order upon the administra-

tors of a public pension fund and direct, inconvenience or confuse them in any way. The party who argues so vociferously against such an action is the very party who has embroiled the IMRF in this litigation. The IMRF, through interpleader, in essence has laid the death benefit before the circuit court and asked, "Who do we pay?" The IMRF took no position as to which claimant is entitled to the death benefit. By its own pleadings, the IMRF requested an equitable resolution of this matter and agreed to pay as ordered by the court. The IMRF takes no position as to which claimant is entitled to the benefit. The claimants themselves asked for a declaration of their rights in the *res*.

We agree with the appellate court's decision in *Carlson* to the extent that it held no statute or precedent prohibited a public pension fund from agreeing to make payment to a nonemployee, divorced spouse entitled to pension benefits. See *Carlson*, 269 Ill. App. 3d at 470-71. In June of 1998, the IMRF filed in the circuit court a counter-complaint for interpleader, agreeing to pay the death benefit to "the person lawfully entitled thereto." Nancy Smithberg is entitled to James Smithberg's death benefit. Given *these* facts and circumstances, the only matter remaining to be resolved concerns the mechanics of that resolution.

In view of the IMRF's interpleader and presence in this case as a litigant, we deem it proper and most expedient to consider done that which ought to have been done. As the appellate court ordered, summary judgment should be entered in favor of Nancy Smithberg.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*